| | | |
|---|---|---|
| MICHAEL S. HELMSTETTER, | ) | |
| | ) | |
| Appellant, | ) | No. 20 C 5485 |
| | ) | |
| v. | ) | Bankruptcy No. 19-28687 |
| DAVID HERZOG, Trustee, | ) | |
| RICHARD RUSCITTI, and | ) | Judge Rebecca R. Pallmeyer |
| KINGDOM CHEVROLET, INC., | ) | |
| | ) | |
| Appellees. | ) | |

## MEMORANDUM OPINION AND ORDER

Appellant Michael S. Helmstetter was the minority owner and an employee of two car dealerships. A dispute between Helmstetter and the majority shareholder led to litigation in state court and ultimately to a Chapter 7 bankruptcy petition. Helmstetter filed the petition in October 2019. By August 2020, Appellee David Herzog, the appointed Trustee for the bankruptcy estate, had negotiated an agreement to settle the estate's disputes with the dealerships—Kingdom Chevrolet, Inc. ("Kingdom") and South Chicago Nissan, d/b/a Western Avenue Nissan ("Western Avenue")—and the majority owner, Richard Ruscitti. Over Helmstetter's objection, Bankruptcy Judge Jacqueline P. Cox granted Herzog's motion for approval of the settlement agreement and transfer of assets. Arguing that the Trustee undervalued his estate, Helmstetter appeals. For the reasons explained below, the court denies Helmstetter's motion to supplement the record and grants the Trustee's motion to dismiss the appeal for lack of standing.

## BACKGROUND

### A. State Court Proceedings

From the complicated and sometimes inconsistent record, the court gleans the following: Helmstetter is a former employee of Kingdom and claims to own at least 33 percent of the company. (*See, e.g.*, Trustee Motion for Approval of Settlement of Disputes and Transfer of Assets ("Mot. to Approve Settlement"), Appellant Record on Appeal ("Appellant ROA") [11-2] at

PageID#: 428; BERO Report, Exs. B, C to Helmstetter Objection to Mot. to Approve Settlement, Appellant ROA at PageID#: 601.)  Kingdom operates an automobile dealership in Chicago, Illinois.  (Mot. to Approve Settlement at PageID#: 428.)  The parties do not specify how or when Helmstetter's employment with Kingdom ended, but it appears that Ruscitti fired him sometime in 2014.  (*See* BERO Report at PageID#: 601.)  Kingdom is an S-Corporation (*id.*), meaning that it "pass[es] corporate income, losses, deductions, and credits through to [its] shareholders for federal tax purposes."  (S Corporations, Internal Revenue Service, https://www.irs. gov/businesses/small-businesses-self-employed/s-corporations (last visited July 12, 2021); *see also* Mot. to Approve Settlement at PageID#: 435–36 (indicating that Kingdom is a closely held corporation).)  Ruscitti is the majority owner of Kingdom.  (Mot. to Approve Settlement at PageID#: 429.)

Helmstetter also maintains that he has a 25 percent ownership interest in Western Avenue.  (*Id.* at PageID#: 428.)  Like Kingdom, Western Avenue is a closely held corporation of which Ruscitti is the majority owner and operates an automobile dealership in Chicago, Illinois.  (*Id.* at PageID#: 429, 435–36.)  Helmstetter is a former employee of Western Avenue, as well.  (*See* BERO Report at PageID#: 614 (stating that "Ruscitti fired Helmstetter from Western Avenue Nissan" in August 2014).)[1]

Finally, Helmstetter claims that he has an ownership interest in two unidentified reinsurance companies (the "Reinsurance Companies").  (Mot. to Approve Settlement at PageID#: 428.)  Ruscitti is a full or partial owner of the Reinsurance Companies and contends that Helmstetter has no ownership interest in them.  (Proposed Settlement Agreement, Appellant ROA at PageID#: 440.)  The Trustee eventually identified the Reinsurance Companies and, as it turns out, there are eight, not two.  (Mot. to Approve Settlement at PageID#: 429 n.4.)  Neither the number of companies nor their names are relevant to the outcome of this appeal.

---

[1]     Western Avenue is not an Appellee.  Neither side explains why.

The falling-out between Helmstetter and the dealerships led to Helmstetter's filing an accounting action in state court (the "Chancery Action") against Ruscitti, Kingdom, and Western Avenue on December 17, 2014. (Proposed Settlement Agreement at PageID#: 439.)[2]  Seeking to enforce his ownership interest in Kingdom and his claimed ownership interest in Western Avenue and the Reinsurance Companies, Helmstetter sought to compel examination of Kingdom and Western Avenue's books and records.  (Mot. to Approve Settlement at PageID#: 429; Proposed Settlement Agreement at PageID#: 439.)  On March 29, 2017, Helmstetter added claims alleging deprivation of corporate distributions and loss of corporate opportunities. (Proposed Settlement Agreement at PageID#: 439.)  On June 22, 2017, Ruscitti, Kingdom, and Western Avenue filed counterclaims, asserting that Helmstetter engaged in misconduct while employed at Kingdom and/or Western Avenue. (*Id.*)  According to the counterclaims, Helmstettler fraudulently approved a payment of more than $700,000 for "unrealized advertising services"[3]; purchased a stolen vehicle for $25,000 and attempted to resell it; and maintained an "improper relationship" with a subordinate who allegedly was stealing from the dealerships.  (*Id.*)  The bankruptcy record shows that Ruscitti, Kingdom, and Western Avenue seek $1,383,596.69 in damages for the counterclaims.  (Second Am. Schedules at PageID#: 536.)  It is not clear from the bankruptcy record why the damages request substantially exceeds $725,000.

On March 3, 2015, Kingdom and Western Avenue filed a separate lawsuit against Helmstetter in the Circuit Court of Cook County, asserting claims for breach of fiduciary duty and fraud (the "Fraud Action").  (*Id.*)[4]  The bankruptcy record that Helmstetter provided to this court

---

[2]     That case is *Helmstetter v. Kingdom Chevrolet, Inc.*, Case No. 2014 CH 20208. (Proposed Settlement Agreement at PageID#: 439.)

[3]     The parties do not explain what the "unrealized advertising services" were, why Helmstetter allegedly paid $700,000 for them, to whom he allegedly paid that sum, or whether he had a relationship with the recipient.

[4]     That case is *Kingdom Chevrolet, Inc. v. Helmstetter*, Case No. 2015 L 002134. (*Id.*)

does not contain further information about those claims.[5]

As of October 9, 2019, the Chancery and Fraud Actions (collectively, the "Circuit Court Litigation") were nearly five years old, but discovery was not complete; the parties had exchanged some written discovery, but they had taken no depositions, nor had they engaged in expert discovery. (Mot. to Approve Settlement at PageID#: 433.) On October 9, 2019, Helmstetter filed his voluntary Chapter 7 bankruptcy petition. (*Id.* at PageID#: 427.) According to Helmstetter, he did so "[a]t least in part because of the costs and length of" the Circuit Court Litigation. (Helmstetter Appellant Br. [37] at 6.) The Chapter 7 filing resulted in an automatic stay of the Circuit Court Litigation. (Trustee Mot. to Dismiss at 2 (citing 11 U.S.C. § 362).)

## B.    Chapter 7 Proceedings

Chapter 7 of the Bankruptcy Code "gives an insolvent debtor the opportunity to discharge his debts by liquidating his assets to pay his creditors." *Law v. Siegel*, 571 U.S. 415, 417 (2014) (citing 11 U.S.C. §§ 704(a)(1), 726, 727). Filing a bankruptcy petition under Chapter 7 "creates a bankruptcy 'estate' generally comprising all of the debtor's property." *Id.* (citing 11 U.S.C. § 541(a)(1)). "The estate is placed under the control of a trustee, who is responsible for managing liquidation of the estate's assets and distribution of the proceeds." *Id.* (citing 11 U.S.C. § 704(a)(1) (providing that the trustee shall "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest")).

### 1.    Procedural History

On October 21, 2019, David Herzog was appointed as the Trustee in Helmstetter's

---

[5]    The Trustee states that Helmstetter's adversaries in the Circuit Court Litigation seek "$700,000.00 and $1,383,591.69" in damages. (Trustee Mot. to Dismiss [14] at 8.) Because the bankruptcy record states that the defendants in the Chancery Action seek approximately $1.38 million in damages for the counterclaims, the court assumes that the request for $700,000 relates to the fraud allegations—despite that $700,000 appears to align with the conduct charged in the Chancery Action counterclaims rather than the Fraud Action.

Chapter 7 case. (Bankruptcy Court Docket, Appellant ROA at PageID#: 49). On November 4, 2019, Helmstetter filed the first of three sets of Schedules of Assets and Liabilities that he ultimately submitted to the Bankruptcy Court. (Original Schedules, Appellant ROA at PageID#: 139–212.) On March 10, 2020, the Trustee filed a motion under Federal Rule of Bankruptcy Procedure 2004 for leave to examine Helmstetter and collect documents Helmstetter had failed to provide regarding (among other things) his financial condition and the disclosures in the Schedules. (Rule 2004 Mot., Appellant ROA at PageID#: 310–17.) The Bankruptcy Court granted the motion on March 17, 2020. (Bankruptcy Court Docket at PageID#: 320.) When the Rule 2004 examination occurred is not clear from the record, but on April 9, 2020, Helmstetter filed the second iteration of his Schedules of Assets and Liabilities. (First Amended Schedules, Appellant ROA at PageID#: 321–90).

On August 11, 2020, the Trustee filed a motion for entry of an agreed order in which Helmstetter, Ruscitti, Kingdom, and the Trustee agreed that: (1) Helmstetter once owned at least 33 percent of the shares of common stock of Kingdom; (2) any transfers of said shares that Helmstetter claimed to have made are null;[6] and (3) pursuant to the Chapter 7 petition, the Trustee is the sole owner of Helmstetter's 33 percent interest in Kingdom. (Mot. for Entry of Agreed Order at PageID#: 411–17; Agreed Order at PageID#: 418, 420.) The agreed order also provided that the Trustee "is the sole owner of . . . 25% of the stock of [Western Avenue]." (Agreed Order at 418, 420.) As Ruscitti and Western Avenue continue to deny that Helmstetter has any ownership interest in Western Avenue (*see, e.g.*, Proposed Settlement Agreement at

---

[6] According to the Trustee, Helmstetter "disclosed on his Schedules and Statement of Financial Affairs transfers within one year of the Petition Date of some or all of the shares of Kingdom and Western Avenue to three entities": Zephyr 2020, Inc., which is a Nevada corporation solely owned by Helmstetter; the Helmstetter Family Trust; and the Helmstetter Children's Trust. (Mot. for Entry of Agreed Order, Appellant ROA at PageID#: 415; *see also* Agreed Order, Appellant ROA at PageID#: 418.) The parties agree that the stock transfers were "never completed by being registered with the requisite stock registry of" the dealerships. (Agreed Order at PageID#: 418.)

PageID#: 440; Trustee Mot. to Dismiss at 7), the court understands the agreed order as providing that if a court later determines that Helmstetter did once own 25 percent of Western Avenue's stock, the Trustee would be the sole owner of that stock.

Also on August 11, 2020, the Trustee moved for approval of the settlement agreement challenged in this appeal, resolving claims between the Trustee, Kingdom, Western Avenue, and Ruscitti, and a transfer of assets under 11 U.S.C. § 363(f).[7]  (Mot. to Approve Settlement at PageID#: 422–38; Proposed Settlement Agreement at PageID#: 439–50.)  The settlement agreement would end the state court litigation.  It called for release of all parties in the Circuit Court Litigation from all claims and counterclaims; required them to file pleadings dismissing the claims and counterclaims with prejudice; and directed the Trustee to release any other past, present, or future claims of the estate against Ruscitti, Kingdom, Western Avenue, the Reinsurance Companies, and any other entities that Ruscitti owns in whole or in part.  (Proposed Settlement Agreement at PageID#: 440–42.)  The settlement agreement would also require Ruscitti and/or Kingdom to pay $555,000.00 "in good funds to the Trustee for the benefit of the Estate."  (*Id.* at PageID#: 441.)  And it would require the Trustee to transfer to Ruscitti and/or Kingdom the Trustee's rights, titles, and interests in Kingdom, Western Avenue, and the Reinsurance Companies—whether "real, apparent or disputed."  (Mot. to Approve Settlement at PageID#: 430; *see also* Proposed Settlement Agreement at PageID#: 441; 11 U.S.C. § 363(f) (permitting a trustee to sell property of the estate "free and clear of any interest in such property of an entity other than the estate" in certain circumstances).)[8]

---

[7]      The title of the Trustee's motion to approve the settlement agreement suggests that the agreement resolves claims only for the Trustee, Ruscitti, and Kingdom.  (*See* Mot. to Approve Settlement at PageID#: 422, 427.)  But the agreement itself states that Western Avenue is also a party.  (*See* Proposed Settlement Agreement at PageID#: 439.)

[8]      The settlement agreement would also require the Trustee to release the estate's interest in an entity called "Kingdom Advertising" and in a domain name, Westernavenissan.com. (Mot. to Approve Settlement at PageID#: 430; Proposed Settlement Agreement at PageID#: 440–41.)  In the briefing submitted to this court, neither side discusses these provisions.

Some two weeks later, on August 26, 2020, Helmstetter filed his third set of Schedules of Assets and Liabilities. (Second Amended Schedules, Appellant ROA at PageID#: 475–559.) He also filed, on August 31, 2020, an objection to the Trustee's motion for approval of the settlement agreement, discussed in more detail below. (Helmstetter Obj., Appellant ROA at PageID#: 590–95.) Bryan D. King, whose law firm (Brown, Udell, Pomerantz & Delrahim (the "Brown Firm")) had represented Helmstetter in the Circuit Court Litigation, also objected. (*See* Brown Firm Obj., Appellant ROA at PageID#: 588-89; Original Schedules at PageID#: 146; Trustee Mot. to Dismiss at 6 n.3.) In its objection, the Brown Firm argued that the settlement agreement did not sufficiently advise the Bankruptcy Court of a secured claim it had filed against the estate for the work it had completed in the Circuit Court Litigation. (Brown Firm Obj. at PageID#: 588.)

After a telephone hearing on September 1, 2020, Judge Cox granted both motions. (*See* Sept. 1, 2020 Hr'g Tr. [39]; Order Approving Settlement, Appellant ROA at PageID#: 625–26; Order Entering Agreed Order, Appellant ROA at PageID#: 627.) This appeal, timely filed by Helmstetter on September 15, 2020, followed.[9] Helmstetter did not request a stay pending appeal or post a bond, but the Trustee has not yet executed the terms of the settlement agreement. (*See* Trustee Mot. to Dismiss at 2.)

### 2. Helmstetter's Schedules of Assets and Liabilities

Helmstetter's Schedules of Assets and Liabilities are central to his appeal and the other motions before this court. As noted, Helmstetter has filed three different sets of Schedules, each under penalty of perjury. (*See* Original Schedules at PageID#: 211; First Am. Schedules at PageID#: 389–90; Second Am. Schedules at PageID#: 554.) Attorney J. Kevin Benjamin represented Helmstetter when he filed the Original and First Amended Schedules. (*See* Bankruptcy Court Docket, Appellant ROA at PageID#: 50, 52.) Helmstetter substituted Richard L.

---

[9]     The Brown Firm did not file an appeal.

Hirsh as his counsel in May 2020, and it was Hirsh who represented Helmstetter when he filed the Second Amended Schedules. (*Id.* at PageID#: 52, 53.) The Second Amended Schedules incorporate analysis from a third attorney (Nicola S. Tancredi) and two forensic accountants (hereinafter, the "BERO Group"). (*See, e.g.*, Helmstetter Obj. at PageID#: 590–91.)

As shown in the following chart, Helmstetter's estimates of the value of his total assets and liabilities, all furnished under oath, have varied significantly. The estimated value of his liabilities increased by millions of dollars from the time he filed his Original Schedules to the time of the First Amended Schedules and by millions more by the time of the Second Amended Schedules. His estimated assets are similar in the Original and First Amended Schedules, but have ballooned from some $8 million in those schedules to nearly $60 million in the Second Amended Schedules.

| | All Assets | Kingdom Assets | Liabilities | Balance |
|---|---|---|---|---|
| **Original Schedules (Nov. 4, 2019)** | $8,414,579.67 | $5,000,000.00 | $6,597,144.72 | $1,817,434.95 |
| **First Amended Schedules (Apr. 9, 2020)** | $8,415,919.67 | $7,500,000.00 | $10,652,390.01 | ($2,236,470.33) |
| **Second Amended Schedules (Aug. 26, 2020)** | $59,840,319.27 (revised to $43,000,000 in Helmstetter's briefing on appeal) | $18,500,000.00 | $19,978,842.25 | $39,861,477.01 |

(Trustee Mot. to Dismiss at 5–6 (providing chart); *see* Original Schedules at PageID#: 146, 148; Nov. 5, 2019 Summary of Assets and Liabilities, Appellant ROA at PageID#: 236–37; First Am. Schedules at PageID#: 325, 328, 330, 388; Second Am. Schedules at PageID#: 479, 483, 489; Aug. 26, 2020 Summary of Assets and Liabilities, Appellant ROA at PageID#: 574.)

Helmstetter has now dialed that inflation back in part. (Helmstetter Opp. to Trustee Mot. to Dismiss ("Helmstetter Opp.") [25] at 11 n.5 (maintaining "certain sums [were entered] under different categories" in the Second Amended Schedules, which resulted in an "overstatement").)

According to Helmstetter, the total value of his assets is $43 million. (*Id.*) If that is true, the value of his assets exceeds his liabilities (according to the Second Amended Schedules) by some $23 million—by the court's calculation. Curiously, Helmstetter himself states that the balance is $20 million. (*See, e.g.*, *id.* (stating that despite the "overstatement" of the total value of assets, the BERO Group "stand[s] behind the estimated surplus of $20 million").)

At the time the Trustee negotiated the proposed settlement agreement and transfer of assets, Helmstetter had not yet filed the Second Amended Schedules, and the Trustee therefore relied on the information set forth in the First Amended Schedules. (*See* Helmstetter Obj. at PageID#: 590; Trustee Mot. to Dismiss at 6; Helmstetter Opp. at 9.)[10]

### a.  Kingdom Assets

As the court understands the Original Schedules, Helmstetter valued his potential recovery in the Circuit Court Litigation (where he sought to enforce his ownership interest in the dealerships) at $5 million, a projected recovery he identified as the "Kingdom Assets." (Original Schedules at PageID#: 146.) In the First Amended Schedules, it appears that Helmstetter identified the Kingdom Assets as (1) the Circuit Court Litigation (which he again valued at $5 million) and (2) his alleged ownership interest in the Reinsurance Companies, which he valued at $2.5 million. (First Am. Schedules at PageID#: 325, 328.) And in the Second Amended Schedules, Helmstetter again identified the Kingdom Assets as (1) the potential recovery in the Circuit Court Litigation, which he now valued at $16 million and (2) his interest in the Reinsurance Companies, which he again valued at $2.5 million. (Second Am. Schedules at PageID#: 479,

---

[10]  According to Helmstetter, attorney Tancredi tried to contact the Trustee by phone before the Trustee moved for approval of the settlement agreement, in an effort to present the BERO Group's analysis of Helmstetter's assets and liabilities. (Helmstetter Opp. at 5–6.) The court has found no reference to that telephone call in the record of the Bankruptcy Court proceedings, however, and therefore disregards it. *See, e.g.*, *Diekemper v. Eggman*, No. 12-CV-1219-JPG, 2013 WL 1308976, at *2 (S.D. Ill. Apr. 1, 2013), *aff'd sub nom. In re Diekemper*, No. 13-1843, 2013 WL 6438404 (7th Cir. Aug. 22, 2013) (when adjudicating a bankruptcy appeal, a district court can consider only documents that were presented to the bankruptcy court).

483.)

Helmstetter's valuation of the Circuit Court Litigation in the Second Amended Schedules is, thus, more than triple the amount at which he valued that same asset in the Original and First Amended Schedules. The court has located an asset-by-asset breakdown of the Circuit Court Litigation only in the BERO Report—which Helmstetter did not file with his Second Amended Schedules, and appears only as an exhibit to his objection to the proposed settlement agreement. The BERO Group prepared that report from an analysis of Kingdom's financial documents from May 2016 and earlier. (*See* BERO Report at PageID#: 601–11.)[11] Based on those documents, the BERO Group estimated that Kingdom owes Helmstetter $12.7 million or more, comprising: $7 million, which the BERO Group estimated is 33 percent of the present-day market value of Kingdom; $1.1 million in unpaid salary and bonuses; $3.1 million in "unpaid dividends"; $1.5 million, which the BERO Group estimated is 33 percent of the "excess executive compensation" allegedly paid to Ruscitti in unspecified years; and several assets whose value the BERO Group did not estimate. (BERO Report at PageID#: 604–05.)

In its Report, the BERO Group does not explain specifically how its $12.7 million figure rounds up to $16 million. Perhaps the BERO Group was also counting Helmstetter's disputed 25 percent ownership interest in Western Avenue among the Kingdom Assets. The BERO Report analyzed Western Avenue's financial statements and tax returns dated December 2015 and earlier (again because Helmstetter reportedly did not have more current records at the time he filed his objection in the Bankruptcy Court). (*See* Helmstetter Obj. at PageID#: 593.) Based on those early documents, and assuming that Helmstetter has a 25 percent ownership interest in Western Avenue, the BERO Group estimated that Western Avenue owes Helmstetter $4,082,000

---

[11]     When Helmstetter filed his objection in the Bankruptcy Court, he reportedly did not have access to Kingdom documents post-dating May 2016, but he did not say why. (*See* Helmstetter Obj. at PageID#: 593 (stating that the BERO Group relied on documents "produced to date" and on publicly available materials).) Helmstetter did not file the documents underlying the BERO Report in the Bankruptcy Court. (*See id.* at PageID#: 594.)

million or more, comprising: $1.6 million, which the BERO Group estimated is 25 percent of the present-day market value of Western Avenue; $1.1 million in unpaid salary and bonuses; $1.3 million in "unpaid dividends," which the BERO Group estimated is 25 percent of the "dividends paid to Ruscitti in 2015"; $82,000, which the BERO Group estimated is 25 percent of "rent [paid] in excess of [Western Avenue's] lease agreement"; and several assets whose value the BERO Group did not estimate. (BERO Report at PageID#: 615–16.)

The Kingdom- and Western Avenue-related assets described in the BERO Report total $16.8 million.

### b. Other Assets

Helmstetter's "other" assets consist of all of his assets that are not part of the Kingdom Assets: $3,414,579.67 in the Original Schedules and $915,919.67 in the First Amended Schedules. Neither side explains the reason for the difference, but the court assumes that the answer lies in how Helmstetter counted his alleged interest in the Reinsurance Companies (*i.e.*, as an "other" asset or a Kingdom Asset). The parties do not discuss what kind of property comprised the "other" assets in the Original and First Amended Schedules.

In his third submission, Helmstetter's valuation of his "other" assets grew from less than $1 million to $24.5 million: the Second Amended Schedules (as revised by Helmstetter in his briefing before this court) reported $43 million in total assets including $18.5 million in Kingdom Assets. Helmstetter told the Bankruptcy Court that the "other" assets include 23 "claims . . . against various third parties" that, according to Tancredi and the BERO Group, are worth approximately $20 million. (Helmstetter Obj. at PageID#: 590–91.) Neither side discusses what kind of property comprises the remaining $4.5 million in "other" assets.

In the objection he filed with the Bankruptcy Court, Helmstetter did not describe the claims he has against third parties. Instead, he simply attached to the objection a chart that he had previously attached to the Second Amended Schedules. (*See* Ex. A to Helmstetter Obj., Appellant ROA at PageID#: 596–600; Third-Party Claim Chart, Appellant ROA at PageID#: 555–

59.) That chart presents no basis for the $20 million valuation. The first claim is a representative example: the chart identifies the parties and the purported causes of action, including "fraudulent financial accounting practices." (Ex. A to Helmstetter Obj. at PageID#: 596.) The chart values that claim at $7.5 million based on the following description: Claim by "Michael Helmstetter/New City Historic Auto Row, Inc." against "FCA/Santander for damages caused by FCA/Santander by unordered vehicles forced onto New City Historic Auto Row, Inc., and for Santander forcing the dealership into default and alleged tortious interference by Santander in the dealership's business operations." (*Id.*) According to Helmstetter's objection, New City Historic Auto Row, Inc. is "one of [his] dealerships." (Helmstetter Obj. at PageID#: 592.) Without more context, there is no way to estimate the value of this claim, let alone contend that the value is as much as $7.5 million, or discern whether Helmstetter would, in his individual capacity, be entitled to the full amount of any recovery.

Notably, although Helmstetter stated in the objection he filed with the Bankruptcy Court that he has 23 claims against third parties whose total value is $20 million (*see id.* at PageID#: 591), the Third-Party Claim Chart lists more than 23 claims and values them at more than twice that amount—the Chart estimates that the total value of third-party claims exceeds $40 million. In other words, it appears that Helmstetter is not counting everything in the chart as an "other" asset. The court can detect two reasons for this. First, one of the claims listed in the chart is the Circuit Court Litigation, valued at $16.8 million. (*See* Third-Party Claim Chart at PageID#: 555; Ex. A to Helmstetter Obj. at PageID#: 596.) Helmstetter counts the Circuit Court Litigation (valued at $16 million) as a Kingdom Asset in the Second Amended Schedules, so to treat it as an "other" asset—as he treats the 23 claims against third parties—would double count it. In fact, it appears that Helmstetter did just that when he stated in his Second Amended Schedules that his total assets are approximately $59.8 million. As discussed above, Helmstetter later reduced that estimate by approximately $16.8 million, to $43 million. (*See* Helmstetter Opp. at 11 n.5.) Second, Helmstetter concedes that the statute of limitations has run for certain claims that are

listed in the chart.  (*See* Helmstetter Obj. at PageID#: 591 ("The claims bar date having passed, only 23 claims have been filed and they total about $20,000,000.").)  The court assumes that, because those claims are time-barred, Helmstetter is not planning to pursue them and therefore is not counting them as "other" assets.

        **c.**     **Liabilities**

As noted earlier, the scheduled value of Helmstetter's liabilities tripled between the Original and Second Amended Schedules, and nearly doubled between the First and Second Amended Schedules.  This court could not locate any explanation for the increases in the record that Helmstetter provided on appeal.

        **3.**     **Helmstetter's Objection to the Motion to Approve the Settlement Agreement**

In the motion to approve the settlement agreement, the Trustee stated that he had "compared the value of the agreement with the costs, effort and risks associated with continuing" the Circuit Court Litigation.  (Mot. to Approve Settlement at PageID#: 433.)  He explained why the cost-benefit analysis led him to conclude that the settlement is in the estate's best interest.  (*Id.*)  Helmstetter objected on the ground that the Trustee had not considered the Second Amended Schedules, which, according to Helmstetter, reflect "[t]he true, accurate and appropriate valuation of" his assets.  (Helmstetter Obj. at PageID#: 590.)  Helmstetter maintains that his assets are sufficient to pay all creditors and, after doing so, are "very likely" to leave him a surplus.  (*Id.*)  By contrast, he argued, the proposed $555,000 payment to the estate contemplated under the settlement agreement would be insufficient even to pay his creditors.  (*Id.* at PageID#: 593.)

Helmstetter informed the Bankruptcy Court that attorney Tancredi had sought the Trustee's permission to pursue the Circuit Court Litigation, and was prepared to litigate Helmstetter's other claims against third parties on behalf of the estate.  (*Id.* at PageID#: 592.)  It appears that Helmstetter did not disclose to the Bankruptcy Court how much Tancredi planned to charge for that work.  As discussed below, the Trustee represented to the Bankruptcy Court that Tancredi had proposed charging a 50 percent contingency fee.

**4.     Bankruptcy Court Hearing and Order on Motion to Approve Settlement**

During the September 1, 2020 hearing on the Trustee's motion to approve the settlement agreement, the Trustee's counsel stated that there is "no . . . cash in [the] estate" other than the $555,000 it would receive under the agreement.  (Sept. 1, 2020 Hr'g Tr. [39] at 3:11–13.)  He also emphasized that the Circuit Court Litigation was filed in 2014; has not advanced beyond written discovery; and could "take many more years."  (*Id.* at 3:13–17.)  He reiterated that the Trustee's "duty is to quickly turn assets into cash to distribute to creditors."  (*Id.* at 3:18–19.)

Moreover, the Trustee's counsel noted that there is "no real support" for Helmstetter's contention that the potential recovery in the Circuit Court Litigation is $16 million.  (*Id.* at 8:24–9:3.)  To recover that $16 million, the estate would have to pay the Brown Firm for its prior work and hire Tancredi, "who wants a 50 percent contingent fee."  (*Id.* at 9:6–12; *see also* Mot. to Approve Settlement at PageID#: 434 (same).)  According to the Trustee's counsel, completing those steps would cut a $16 million recovery to "something like $4 million"—which would not come close to paying the $20 million in liabilities recorded in the Second Amended Schedules.  (Sept. 1, 2020 Hr'g Tr. at 9:14–16.)  Finally, the Trustee's counsel argued that, because the estate's liabilities exceed its assets, Helmstetter lacked standing to object to the proposed settlement agreement.  (*See id.* at 9:13–19.)

At the hearing on this motion, Helmstetter's bankruptcy attorney, Hirsh, argued that the proposed settlement undervalued Helmstetter's claims in the Circuit Court Litigation and would deny recovery for any unsecured creditors.  (*Id.* at 4:22–5:1.)  Citing the Second Amended Schedules, the Third-Party Claim Chart, and the BERO Report, Hirsh maintained that the estate's assets could "probably" pay "the general unsecured creditors" and "even possibly [leave] a surplus" for Helmstetter.  (*Id.* at 5:2–19; *see also id.* at 12:2–9 (similar).)  Helmstetter's counsel did not dispute that Tancredi proposed charging a 50 percent contingency fee for his work on the Circuit Court Litigation.  (*See generally id.*)

The Bankruptcy Court granted the Trustee's motion to approve the settlement agreement

on September 1, 2020. (Order Approving Settlement at PageID#: 625–26.) In a written order, the court stated that it had considered whether the estate could successfully litigate the claims involving Ruscitti, Kingdom, and Western Avenue. (*Id.* at PageID#: 626.) The court also stated that it had considered "the complexity, expense and likely duration of such litigation, the possible difficulties in collecting on any judgment which could be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed settlement." (*Id.*) "The most important factor," the court stated, "is that the underlying litigation has been pending since 2014." (*Id.* (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (setting forth factors a bankruptcy court should consider in determining whether a settlement is "fair and equitable")).) The court concluded that the settlement agreement was fair, reasonable, and "in the best interests of the estate." (Order Approving Settlement at PageID#: 626.) The court overruled Helmstetter's and the Brown Firm's objections without additional discussion. (*Id.*)

## DISCUSSION

On September 16, 2020, Helmstetter filed his notice of appeal of the Bankruptcy Court's order approving the settlement agreement and transfer of assets [1]. On November 16, 2020, the Trustee filed a motion to dismiss the appeal [14]. The Trustee argues that because there is "no evidence" to support Helmstetter's assertion that there will be leftover funds after the estate pays all creditors, Helmstetter would not benefit financially from reversal of the Bankruptcy Court's order and therefore lacks standing to challenge it. (Trustee Mot. to Dismiss at 5.) On December 4, 2020, Helmstetter filed a motion "to supplement the record and for leave to file special interrogatories and requests to produce and for alternative relief" ("Helmstetter Mot. to Supplement") [20]. For the reasons explained below, the court denies Helmstetter's motion to supplement the record and dismisses the appeal.

### A. Helmstetter's Motion to Supplement

In his motion to supplement the record, Helmstetter seeks leave to take "special discovery"

regarding the "factual or legal predicate" for the Trustee's argument that Helmstetter cannot reasonably expect a surplus. (Helmstetter Mot. to Supplement ¶¶ 9, 12.) Specifically, Helmstetter asks for permission to serve interrogatories and requests for production of documents that would identify the factual and legal bases for the Trustee's positions that (1) Helmstetter has nearly $20 million in liabilities;[12] (2) the BERO Group's estimate of the estate's likely surplus (approximately $20 million) is incorrect; and (3) the BERO Group's analysis "should not be determinative." (Proposed Interrogatories & Requests for Production, Ex. 1 to Helmstetter Mot. to Supplement [20-1] at 1–5, 6–8.) Assuming that the court grants Helmstetter permission to serve those discovery requests, Helmstetter asks the court to require the Trustee to file whatever responses he provides "as supplements to the record on appeal." (Helmstetter Mot. to Supplement, Prayer for Relief.) In the alternative to supplemental discovery, Helmstetter asks the court to appoint a special master to "investigate" his solvency and to hold an evidentiary hearing on that issue. (*Id.* ¶¶ 18–19.)

The Trustee responds that Helmstetter's motion should be denied because this court cannot properly consider evidence that was not before the Bankruptcy Court. The court agrees. "When considering an appeal from a bankruptcy court, district courts act as appellate courts. . . . As such, a district court considering a bankruptcy appeal may only consider evidence that was before the bankruptcy court and made part of the record." *Diekemper*, 2013 WL 1308976, at *2; *see also In re Loefgren*, 305 B.R. 288, 291 (W.D. Wis. 2003), *aff'd,* 85 F. App'x 522 (7th Cir. 2003) (similar).

By definition, the evidence that Helmstetter seeks was not before the Bankruptcy Court. Furthermore, Helmstetter does not dispute that he made no attempt to obtain the evidence in the bankruptcy proceedings, and he provides no explanation for his failure to do so. Finally,

---

12 Helmstetter's challenge to the amount of his liabilities is puzzling because, in the Second Amended Schedules, he confirms that his liabilities are $19,978,842.25. (Second Am. Schedules at PageID#: 574.) He has never revised that figure or stated that it is incorrect.

Helmstetter's contention that the Trustee did not make adequate attempts to gather and value his assets is unpersuasive, especially considering the Trustee's statement in his Rule 2004 motion that Helmstetter himself failed to cooperate with several requests for discovery concerning his assets and liabilities. (Rule 2004 Mot. at PageID#: 313.) Even without that, Helmstetter's argument is waived because he does not explain how the Trustee's efforts to gather and value his assets were deficient. (Helmstetter Reply to Mot. to Supplement [27] at 2; *see Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 425 (7th Cir. 2019) ("arguments that are underdeveloped, conclusory, or unsupported by law are waived" (internal quotation marks omitted)).)

Helmstetter's motion to take additional discovery and for alternative relief is denied. Helmstetter cites no authority for the proposition that the court can or should appoint a special master in this circumstance, and the court does not need an evidentiary hearing to understand the record.

**B.      Trustee's Motion to Dismiss**

In his motion to dismiss, the Trustee argues that Helmstetter lacks standing to appeal the Bankruptcy Court's order approving the settlement and transfer of assets, and that this court must therefore dismiss the appeal. As discussed here, the court agrees.

**1.      Legal Standard**

A federal district court has jurisdiction to hear appeals from a bankruptcy court's "final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). The Bankruptcy Court's order approving the settlement agreement and transfer of assets was a final judgment because it resolved all disputes between the estate, Kingdom, Western Avenue, and Ruscitti. *See, e.g.*, *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) ("Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."). A district court reviews a bankruptcy court's approval of a settlement "deferentially, for abuse of discretion." *In re Drs. Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007). "The abuse of discretion standard recognizes that because of the bankruptcy judge's unique position,

second-guessing by appellate courts will do little to improve upon bankruptcy judges' decisions." *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586–87 (7th Cir. 1994) (internal quotation marks omitted). "Factual findings are reviewed for clear error; legal conclusions are reviewed de novo." *In re Drs. Hosp.*, 474 F.3d at 426; *see also, e.g.*, *In re Jepson*, 816 F.3d 942, 945 (7th Cir. 2016). Likewise, although a bankruptcy court cannot simply "rubber stamp" a trustee's settlement decision, it must give "[s]ome deference . . . to the trustee's expertise." *In re Commercial Loan Corp.*, 316 B.R. 690, 698 (Bankr. N.D. Ill. 2004) (internal quotation marks omitted). This court will exercise jurisdiction to review the merits of Helmstetter's appeal only if he has standing to challenge the bankruptcy court's order. *See, e.g.*, *In re GT Automation Grp., Inc.*, 828 F.3d 602, 604 (7th Cir. 2016). The burden is on Helmstetter to show that he does. *Id.* at 605.

In its bankruptcy jurisprudence, the Seventh Circuit has discussed both Article III standing and "bankruptcy standing." *See, e.g.*, *id.* at 604–05 & n.1. To establish Article III standing, the plaintiff must show that he "has suffered an 'injury in fact,' which is 'fairly traceable' to the challenged action of the defendant, and which would 'likely' be redressed by a favorable decision." *Id.* at 604 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–62 (1992)). Mere speculation that a favorable decision would redress the injury is insufficient. *See GT Automation*, 828 F.3d at 604. "In the bankruptcy context," the Seventh Circuit has explained that "an appellant lacks standing if it is 'unable to realize any economic benefit from a potential reversal.'" *Id.* (quoting *In re Stinnett*, 465 F.3d 309, 315 (7th Cir. 2006)). Thus, in *GT Automation*, an unsecured creditor failed to demonstrate Article III standing where it could not say whether it "would get 'even a dollar' from a favorable decision"; argued only that it was "theoretically possible" that it could receive some financial benefit; did not know how many claims had been filed against the estate that would take priority over its own; and did not know the likelihood that the bankruptcy court would approve any of those claims. 828 F.3d at 605.

In decisions predating *GT Automation*, the Seventh Circuit has referred to "bankruptcy standing" as "'a form of prudential standing' . . . that is 'narrower than Article III standing.'" *GT*

*Automation*, 828 F.3d at 605 n.1 (quoting *In re Ray*, 597 F.3d 871, 875 (7th Cir. 2010); *In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607 (7th Cir. 1998)). The court in *Cult Awareness* stated that to establish "bankruptcy standing," "a person must have a pecuniary interest in the outcome of the bankruptcy proceedings." *Cult Awareness*, 151 F.3d at 607. It further explained that "[i]f the debtor can show a reasonable possibility of a surplus after satisfying all debts, then the debtor has shown a pecuniary interest and has standing to object to a bankruptcy order." *Id.* at 608; *see also, e.g.*, *Stinnett*, 465 F.3d at 315 (quoting same); *In re Andreuccetti*, 975 F.2d 413, 416 (7th Cir. 1992) ("A 'person aggrieved' by a bankruptcy order must demonstrate that the order diminishes the person's property, increases the person's burdens, or impairs the person's rights." (internal quotation marks omitted)).

There is some debate regarding whether the Seventh Circuit's characterization of "bankruptcy standing" as a form of prudential standing survives the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). In *Lexmark*, the Court considered "the appropriate analytical framework for determining a party's standing to maintain an action for false advertising under the Lanham Act." *Id.* at 125 (internal quotation marks omitted). The defendant agreed that the plaintiff had Article III standing but argued that the Court should "decline to adjudicate" the claim for "prudential" rather than constitutional reasons. *Id.* at 125–26. The Court refused that request. *See id.* at 128. It reiterated that a federal court's duty to decide cases that are within its jurisdiction "is virtually unflagging." *Id.* at 126 (internal quotation marks omitted). The Court then explained that although it had used the term "prudential standing" in recent jurisprudence, the label was inapt because the Court had been using it to describe what was actually an issue of statutory interpretation: "whether a legislatively conferred cause of action encompasse[d] a particular plaintiff's claim." *See id.* at 126–28. The Court warned that "[j]ust as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied . . . it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Id.* at 128. In *GT Automation*, the Seventh Circuit flagged this discussion,

suggesting that it might affect whether "the standing analysis in bankruptcy cases involves any 'prudential' considerations." 828 F.3d at 605 n.1. But because the case before the Seventh Circuit concerned only Article III standing, it left that question to another day. *See id.*

Here, Helmstetter advances only one theory of standing: that the estate will have a surplus after it pays all creditors, and that reversing the Bankruptcy Court's order would permit him to collect the surplus. The Trustee, for his part, contends that Helmstetter offers only conjecture to support his theory. The parties' dispute sounds in Article III. *See GT Automation*, 828 F.3d at 604 (appellant lacks standing if he is "unable to realize any economic benefit from a potential reversal" of the bankruptcy court's order). Notably, the "pecuniary interest" test has the same focus; indeed, the Seventh Circuit cited it in articulating the Article III standard for bankruptcy cases. *See Stinnett*, 465 F.3d at 315 ("To have standing to object to a bankruptcy order, a person must have a pecuniary interest in the outcome of the bankruptcy proceedings." (quoting *Cult Awareness*, 151 F.3d at 607); *GT Automation*, 828 F.3d at 604 (quoting same). The parallels between the standards support a conclusion that where, as here, debtor standing turns only on the possibility of recovering a surplus, the framework for assessing Article III and "bankruptcy" standing is the same. At its core, it asks whether that possibility is too remote to support the exercise of the court's jurisdiction. *See GT Automation*, 828 F.3d at 605 ("theoretical[ ] possib[ility]" that favorable decision would yield financial benefit is insufficient to confer standing); *Cult Awareness*, 151 F.3d at 608 (debtor must show a "*reasonable* possibility of a surplus" (emphasis added)). To establish that he has standing here, Helmstetter must show more than a remote possibility that he could recover a surplus if the Bankruptcy Court's decision is reversed. It bears mention that in discussing both Article III standing and "bankruptcy" standing, the Seventh Circuit has observed that "[d]ebtors, *particularly Chapter 7 debtors*, rarely have" a pecuniary interest in the outcome of a bankruptcy court's order "because no matter how the estate's assets are disbursed by the trustee, no assets will revert to the debtor." *Cult Awareness*, 151 F.3d at 607 (emphasis added); *GT Automation*, 828 F.3d at 604–05 (same).

2.      **Analysis**

The Trustee argues that Helmstetter has offered "no evidence" that "the value of the assets and causes of action involved in the" settlement agreement—*i.e.*, all claims against Ruscitti, Kingdom, Western Avenue, and the Reinsurance Companies—exceeds his $20 million in liabilities. (Trustee Mot. to Dismiss at 5.) He also argues that Helmstetter offers no support for the valuation of his claims against other third parties. (*See id.* at 9.) According to the Trustee, therefore, Helmstetter cannot show that he has a reasonable expectation of recovering a surplus after paying all creditors.

Helmstetter does not dispute that the estate has nearly $20 million in liabilities. (*See generally* Helmstetter Opp.) Citing the Second Amended Schedules and the BERO Report, however, he maintains that the estate will have a surplus of approximately $20 million after paying all creditors. (*Id.* at 11, 12; *see also id.* at 15 (stating that, according to the BERO Group, "it is unclear why Appellant filed bankruptcy at all").)[13] As explained here, the court agrees with the Trustee that Helmstetter's expectation in recovering a surplus is speculative, and that he therefore lacks standing to challenge the Bankruptcy Court's order approving the settlement agreement and transfer of assets.

As the Trustee observes, Helmstetter's valuation of the Kingdom Assets (including his purported interest in the Reinsurance Companies) increased from $7,500,000 to $18,500,000 between the First and Second Amended Schedules. (Trustee Mot. to Dismiss at 6.) According

---

[13]      Yet it was Helmstetter himself who filed the bankruptcy petition. Helmstetter also relies on the affidavit of Deborah J. Temkin, one of the BERO Group's forensic accountants, for the proposition that his estate will have a $20 million surplus. (Temkin Aff., Ex. 1 to Helmstetter Opp. [25-1].) The court strikes the Temkin Affidavit because Helmstetter did not present it to the Bankruptcy Court. *See, e.g.*, *Diekemper*, 2013 WL 1308976, at *2. In any event, the Temkin Affidavit does not help Helmstetter establish that his assets exceed his liabilities. Specifically, it states that the value of Helmstetter's interests in Kingdom is approximately $11.9 million—which is *less* than the $12.7 million value set forth in the BERO Report. (*See* Temkin Aff. ¶¶ 14, 21–26; BERO Report at PageID#: 604–05.) The failure of Helmstetter and Temkin to acknowledge that inconsistency calls into question the reliability of the BERO Group's analysis.

to the Trustee, the only explanation Helmstetter has offered for the increase is his assertion that attorney Tancredi could obtain a judgment in the Circuit Court Litigation of $16 million or more. (*See id.*)  The Trustee contends that the possibility of a $16 million judgment is speculative for several reasons.  First, he states that Helmstetter's 25 percent ownership interest in Western Avenue is "vigorously disputed" and argues that the state court will not necessarily find in Helmstetter's favor on that issue.  (*Id.* at 7.)  The fact that only minimal discovery had been completed in the Circuit Court Litigation before the automatic stay adds to the uncertainty on that issue. (*See id.*)

Second, the Trustee emphasizes that Helmstetter's undisputed 33 percent interest in the market value of Kingdom and his disputed 25 percent ownership interest in the market value of Western Avenue are not liquid assets.  (*See id.* at 8.)  Rather, they are minority shareholder interests in closely held corporations.  (*Id.*)  To liquidate those interests, Helmstetter would need to find a purchaser willing to become a business partner with Ruscitti.  (*Id.*)  That would, as the Trustee observes, limit the market of purchasers—particularly because Ruscitti has been embroiled in litigation with his former business partner—and depress the value of the shares.  (*Id.*) In any event, Helmstetter would be unable to liquidate his minority shares until the Circuit Court Litigation concludes, which will not happen soon, if the pace of the litigation to date is any indication.  These circumstances render it difficult to make an accurate estimate of the future market values of Kingdom and Western Avenue.  (*Id.*)

Third, the Trustee points out that Ruscitti, Kingdom, and Western Avenue have adverse claims against Helmstetter in the Circuit Court Litigation for "$700,000.00 and $1,383,591.69." (*Id.*)  The difficulty in predicting the outcome of the adverse claims "further diminishes the value of the estate's interests in" the Circuit Court Litigation, the Trustee argues.  (*Id.* at 8–9.)  In addition, there is the issue of the contingency fees:  even if the estate recovers $16 million in the

Circuit Court Litigation, the Trustee notes, it would have to pay a 50 percent contingency fee.[14] Finally, the Brown Firm would take a portion of the recovery as payment for its prior work[15] and the estate would owe "administrative costs and Trustee fees." (*Id.* at 9–10.)

Helmstetter brushes these concerns aside, urging that the Trustee's arguments lack "any credible, substantial or material factual predicate or evidentiary foundation" and are "contrary to the manifest weight of evidence." (Helmstetter Opp. at 3.) The court disagrees. In advancing his arguments, the Trustee relies on evidence in the bankruptcy record, including the Original, First, and Second Amended Schedules; undisputed facts about how the Circuit Court Litigation progressed before the bankruptcy stay; undisputed facts about the corporate structures of Kingdom and Western Avenue; and attorney Tancredi's undisputed proposal to charge a 50 percent contingency fee (including the BERO Group's 25 percent fee) to pursue the Circuit Court Litigation. Furthermore, it is Helmstetter's burden to establish that he has standing, *GT Automation*, 828 F.3d at 605, and Helmstetter does not adequately respond to the substance of the Trustee's concerns about his asset valuations.

In his opposition brief, for example, Helmstetter again fails to dispute that Tancredi proposed charging a 50 percent contingency fee in the Circuit Court Litigation. Instead, Helmstetter states that "[e]ven assuming that a contingency fee of 50% . . . might have been initially proposed; there is no reasonable basis that this rate was mandatory." (Helmstetter Opp. at 17.) The court declines Helmstetter's invitation to "take judicial notice" that there are other lawyers available and that "it is reasonable to anticipate that a significant number of Plaintiff

---

[14]     The Trustee had characterized this as a 50 percent contingency fee payable to attorney Tancredi. In his reply, the Trustee explains that Tancredi proposed charging "a 25% contingent fee for his services and an additional 25% contingent fee for the services of the BERO Group." (Trustee Reply [29] ¶ 4.)

[15]     The Trustee states that the Brown Firm's attorneys' fees are "21%." (Trustee Mot. to Dismiss at 9.) It is unclear whether this is a reference to a separate contingency fee that the Brown Firm would take from any recovery, or to the firm's secured claim for work that it already completed.

attorneys would be available at mutually beneficial terms." (*Id.*)  To the contrary, the notion that other attorneys would be willing to propose more reasonable terms to pursue Helmstetter's claims is purely speculative.  On the record that Helmstetter has provided to this court, Tancredi is the only attorney who has offered to pursue the Circuit Court Litigation in place of the Brown Firm, and the only one who has valued the potential recovery from that litigation at $16 million.  And Tancredi's request for such a substantial contingency (including the portion he may be sharing with the BERO Group) speaks volumes about his own confidence in the likely outcome.  Assuming Tancredi could obtain a $16 million judgment, the contingency fees would reduce the estate's interest in the judgment to $8 million.

The Trustee emphasizes that Helmstetter's $16 million valuation of this asset rests on several assumptions, including that Helmstetter will prevail on all claims in the Circuit Court Litigation; that the alleged present-day market values of Kingdom and Western Avenue will be the same when the Circuit Court Litigation concludes; and that Helmstetter will be able to find a buyer for his minority interests in those entities at their fair market prices.  True, the Trustee cannot provide hard evidence that disproves Helmstetter's assumptions.  (*See, e.g.*, Helmstetter Opp. at 10 (arguing that the Trustee "never filed any expert reports or . . . documentation" to show that the $16 million valuation of the Kingdom Assets is incorrect).)  But Helmstetter bears the burden of proof on this issue, and the absence of expert reports or documentation illustrates the Trustee's point: whether Helmstetter has standing depends on events that may or may not occur.  Case law supports the Trustee's argument that the very types of assumptions he identifies undermine debtor standing.  *See, e.g., Cult Awareness*, 151 F.3d at 608 (where debtor had to "win a very large [court] award . . . to have any chance at a surplus" and it was uncertain whether debtor would be able to "collect th[e] judgment, pay its litigation costs and attorneys' fees, and have anything left over," debtor did not show a "reasonable possibility of a surplus" sufficient to confer standing).  Helmstetter has not distinguished *Cult Awareness*, nor has he addressed any other case law about debtor standing.  His failure to show that the Second Amended Schedules (or the

BERO Report) account for these uncertainties casts serious doubt on the notion that he could recover $16 million in the Circuit Court Litigation.

So, too, do several other aspects of the bankruptcy record. Chief among them is that Helmstetter swore to the accuracy of all three Schedules of Assets and Liabilities, yet offers scant support for the substantial increase in the estimated value of the Circuit Court Litigation from $5 million in the first two Schedules to $16 million in the third. The only explanation appears to be a change in counsel. In addition, Helmstetter presented inconsistent valuations of the Circuit Court Litigation in the same submission ($16 million in the Second Amended Schedules versus $16.8 million in the attached Third-Party Claim Chart); he initially double-counted, including both valuations toward his total assets; and in the September 1, 2020 hearing before the Bankruptcy Court, Helmstetter's new counsel stated only that it was "possibl[e]" that the funds in the estate could leave Helmstetter a surplus. (Sept. 1, 2020 Hr'g Tr. at 5:13–19.)

Even if Helmstetter could explain away these concerns regarding valuation of the Kingdom Assets, the Trustee contends that the value Helmstetter assigns to other claims against third parties is "unsubstantiated." (Trustee Mot. to Dismiss at 9.) Relatedly, the Trustee observes that Helmstetter provided no explanation in the bankruptcy record for the total increase in "other" assets from approximately $3.4 million in the Original Schedules to $41.3 million the Second Amended Schedules. (*See id.* at 6, 9.) (To reiterate, Helmstetter now states that the value of total assets is approximately $43 million, *see* Helmstetter Opp. at 11, meaning that the purported total value of "other" assets is approximately $24.5 million. Of that $24.5 million, the claims against third parties purportedly comprise approximately $20 million.)

Again, the court agrees with the Trustee. Helmstetter provides no support for his contention that his claims against third parties are worth $20 million. As discussed above, the Third-Party Claim Chart contains no information that could substantiate the values Helmstetter assigns to each claim. In the Bankruptcy Court, moreover, Helmstetter did not explain whether he included those claims in the Original and First Amended Schedules; if so, how he valued the

claims; and if not, why not. The briefing Helmstetter has submitted to this court suffers the same deficiencies. The court concludes that Helmstetter's $20 million valuation of claims against third parties is conjectural, and that he cannot properly rely on it to show that his assets exceed his liabilities. *Cf. GT Automation*, 828 F.3d at 605 (mere possibility that unsecured creditor could benefit from a favorable decision did not establish standing).

To summarize: Helmstetter concedes that the estate has approximately $20 million in liabilities ($19,978,842.25, to be precise). (Second Am. Schedules at PageID#: 574.) He contends that his total assets are $43 million, comprising: the Kingdom Assets (the Circuit Court Litigation valued at $16 million plus the purported interest in the Reinsurance Companies valued at $2.5 million); claims against third parties valued at approximately $20 million; and unspecified assets valued at $4.5 million. Because Helmstetter's $20 million valuation of his claims against third parties is speculative, the court will not count those claims among the estate's assets. For purposes of this ruling, the court will give Helmstetter the benefit of the doubt on the following issues: Tancredi could recover $16 million in the Circuit Court Litigation (despite the many assumptions on which the $16 million valuation relies); Helmstetter could recover his purported $2.5 million interest in the Reinsurance Companies without litigation (despite that the interest is disputed and appears to be at issue in the Circuit Court Litigation); Helmstetter's estate has $4.5 million in other assets (despite that Helmstetter makes no effort to explain that valuation to this court); the Brown Law firm's secured claim for its work on the Circuit Court Litigation is already recorded as a liability in the Second Amended Schedules; and the potential damages stemming from adverse claims against Helmstetter in the Circuit Court Litigation are already recorded as a liability in the Second Amended Schedules. After paying the 50 percent contingency fee, the estate's interest in the recovery from the Circuit Court Litigation would be no greater than $8 million. The estate's total assets, therefore, are at most $15 million: $8 million plus $2.5 million plus $4.5 million. Fifteen million dollars falls far short of Helmstetter's $19,978,842.25 in liabilities. Helmstetter has no reasonable expectation in recovering a surplus and would not benefit

financially from a reversal of the Bankruptcy Court's order.[16]

Helmstetter's constructive trust theory does not alter this conclusion. Citing the agreed order that the Bankruptcy Court entered on September 1, 2020 (*see* Appellant ROA at PageID#: 627), Helmstetter contends that the Trustee is judicially estopped from disputing that he has a 33 percent ownership interest in Kingdom and a 25 percent ownership interest in Western Avenue. (Helmstetter Opp. at 15–16.)[17] He argues that "earned but unpaid distributions and executive compensation" from Kingdom and Western Avenue became his property "by operation of law" as soon as Ruscitti received distributions and executive compensation from those entities. (*Id.* at 6–7, 17 (citing, *inter alia*, *United States v. Fletcher*, 562 F.3d 839, 843 (7th Cir. 2009) (discussing dispute between United States and taxpayer regarding the point at which a stock transaction counted as income) ("Income is 'received' not only when paid in hand but also when the economic value is within the taxpayer's control; this is known as constructive receipt.")).)

Helmstetter does not explain what he means by "earned but unpaid distributions and executive compensation" from Kingdom and Western Avenue (*see* Helmstetter Opp. at 6, 17), so the court cannot discern how much money Helmstetter contends is in the supposed constructive trust. More important, Helmstetter concedes that litigation would be required to obtain whatever funds are in the constructive trust. (*See* Helmstetter Opp. at 13 ("[A]n experienced commercial litigator could reasonably be expected to successfully prosecute selected partial summary judgments requiring turn-over of those funds . . . from their respective constructive trusts . . . .").) Accordingly, even assuming that the constructive trust contains all assets identified in the BERO

---

[16] Using Helmstetter's inconsistent, $16.8 million valuation of the Circuit Court Litigation would increase the estate's total assets by only $400,000—not enough to alter the conclusion that Helmstetter's liabilities exceed his assets.

[17] The agreed order does not appear to resolve the dispute about Helmsetter's ownership interest in Western Avenue, so the court disagrees that Ruscitti and Western Avenue are judicially estopped from denying that Helmstetter has any such interest. But this does not influence the analysis of Helmstetter's standing.

Report ($16.8 million, comprising, among other things, unpaid salary, bonuses, and dividends from Kingdom and Western Avenue), Tancredi's contingency fee would cut the estate's interest in the constructive trust to $8.4 million. The estate's total assets would be $15.4 million, still significantly less than the estate's liabilities.

The Trustee's alleged failure to challenge the BERO Report does not alter the analysis. (*See* Helmstetter Opp. at 15.) The Second Amended Schedules incorporate the BERO Group's assessment of Helmstetter's assets and liabilities. (*See, e.g.*, *id.* at 9–10; *see also* Helmstetter Obj. at PageID#: 590–91.) The Trustee challenges the Second Amended Schedules, so his arguments necessarily address the BERO Group's conclusions. The court recognizes that the BERO Report post-dates the Second Amended Schedules and could, in theory, supplement or clarify the analysis underlying those Schedules. But Helmstetter does not explain whether that is the case. Moreover, nothing the court has seen in the BERO Report cures the defects that the Trustee identified in the Second Amended Schedules. The BERO Report, for example, does not reduce the value of the Kingdom Assets to reflect Tancredi's 50 percent contingency fee; does not account for the fact that Helmstetter could lose his claims in the Circuit Court Litigation; and does not present a plan for liquidating minority interests in Kingdom and Western Avenue at the market values estimated in the report. (*See, e.g.*, Trustee Reply ¶¶ 2–5.) In a similar vein, the BERO Group used financial documents from 2016 and earlier to estimate the present-day market values of Kingdom and Western Avenue, and, in turn, to estimate the value of Helmstetter's interests in those entities. (*See, e.g.*, *id.* ¶ 5 (observing same).) Like the asset valuations in the Second Amended Schedules, therefore, the asset valuations in the BERO Report are speculative.

In a last-ditch attempt to show that he has standing, Helmstetter argues that if the court "den[ies]" him standing, Helmstetter's creditors—who will lose "large sums" of money if the Bankruptcy Court's order is not reversed—"would petition for relief to either the Executive or Legislative Branches of government." (Helmstetter Opp. at 18.) The court is uncertain of the nature of these petitions, and Helmstetter does not advance a coherent legal argument that the

creditors could seek such relief. Nor are any avenues that may be available to Helmstetter's creditors relevant to Helmstetter's standing to challenge the Bankruptcy Court's order.

Helmstetter has not shown that he has standing to challenge the Bankruptcy Court's order approving the settlement agreement and transfer of assets. The court, therefore, grants the Trustee's motion and dismisses Helmstetter's appeal for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the court denies Helmstetter's Motion to Supplement the Record and For Leave to File Special Interrogatories and Requests to Produce and For Alternative Relief [20]; grants the Trustee's Motion to Dismiss Appeal for Lack of Standing By Appellant [14]; and dismisses Helmstetter's Appeal from U.S. Bankruptcy Court Case Number 19 B 28687 [1]. The Clerk is directed to enter judgment in favor of the Trustee.

ENTER:

Dated: July 13, 2021

_____
REBECCA R. PALLMEYER
United States District Judge